UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BERNARD G. DAVIS,

                      Plaintiff

-vs-

BRIAN FISCHER, et al.,

                    Defendants
_____

         DECISION AND ORDER

         09-CV-6084 CJS

      This is an action pursuant to 42 U.S.C. § 1983, in which Plaintiff, a former prison inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), alleges that Defendants, all employees of DOCCS, violated his federal  constitutional rights. Now pending before the Court are two motions: 1) Plaintiff's motion for summary judgment (Docket No. [#32]); and 2) Defendants' cross-motion for summary judgment [#34].   For the reasons that follow, Plaintiff's application is denied, Defendants' application is granted, and this action is dismissed.

BACKGROUND

      Unless otherwise noted, the following are the undisputed facts of this case.[1]  This action involves incidents at Elmira Correctional Facility ("Elmira") and Five Points Correctional Facility ("Five Points").   On December 24, 2007, at Elmira, Corrections Lieutenant Schonstheimer ("Schonstheimer") requested that Plaintiff be given a urine screen, because he suspected that Plaintiff had used illegal drugs.  Such suspicion purportedly arose from information provided by a confidential informant.  Lieutenant Shaw

---

[1] The facts set forth herein are taken from several sources: Plaintiff's Complaint [#1]; a document he filed in response to Defendants' answers [#15]; and a document he filed in anticipation of a settlement conference [#18], and the parties' summary judgment motions.

("Shaw") placed Plaintiff in the Special Housing Unit ("SHU") to await drug testing and possible disciplinary action.  Later that same day, December 24, 2007, Corrections Officer L. Yost ("Yost") completed a report, indicating that he had taken a urine sample from Plaintiff.  Corrections Officer M. Taylor ("Taylor") allegedly tested Plaintiff's urine sample twice, and both times the results were positive for marijuana use.  Consequently, Taylor issued a misbehavior report, charging Plaintiff with "use of a controlled substance." However, Plaintiff maintains that he is innocent, and that he never gave a urine sample to Yost.

While in SHU, Plaintiff made an apparent suicide attempt, and was then placed in the Mental Health Unit ("MHU") on suicide watch.  Plaintiff was later transferred to the Central New York Psychiatric Center ("CNYPC") for evaluation and treatment. Because of such transfer to CNYPC, Plaintiff's Tier III disciplinary hearing was postponed, until he returned to Elmira on or about February 6, 2008.  Subsequently, S. Cronin ("Cronin"), Deputy Superintendent for Programs at Elmira,  conducted a disciplinary hearing.  The hearing commenced on February 14, 2008 and ended on February 27, 2008.  Taylor testified at the hearing by telephone.  Yost also testified, and Plaintiff asked him various questions concerning the procedures for collecting urine samples.  Plaintiff objected to Yost's testimony, and argued that Yost had not followed the proper procedures. Nevertheless, Cronin found Plaintiff guilty, and imposed a sentence that included twelve months in SHU and loss of privileges.  Cronin indicated that he relied on Taylor's written report and Taylor's testimony at the hearing in determining Plaintiff's guilt.  Cronin indicated that  he was imposing a lengthy SHU sentence because Plaintiff had several prior drug-related misbehavior reports.

Plaintiff appealed the conviction at the facility level, and Superintendent Bradt

("Bradt") affirmed the conviction. See, [#34-7].  On March 6, 2008, Plaintiff filed an appeal

with Norman Bezio ("Bezio"), DOCCS Director of Special Housing/Inmate Discipline. See,

[#34-7] at pp. 14-18.  On or about April 15, 2008, Bezio reversed the conviction, because

Cronin had not followed the mental health procedures set forth in 7 NYCRR § 254.6(b).[2]

*See*, Docket No. [#15] at p. 15.

On May 5, 2008, a re-hearing was conducted by Deputy Superintendent Hopkins

("Hopkins").  By this time, Taylor had retired and was not available to testify at the hearing.

 Moreover, certain documentation concerning the calibration of the urinalysis equipment

had been lost.  Nevertheless, on May 7, 2008, Hopkins found Plaintiff guilty, and imposed

a sentence that again included twelve months in the SHU.  In that regard, Hopkins relied

primarily on Taylor's misbehavior report as proof of Plaintiff's guilt.  Hopkins also relied on

testimony by Corrections Officer Nowaczyk ("Nowaczyk"), who testified concerning the

training that he had personally provided to Taylor in drug testing procedures.  Nowaczyk

also examined Taylor's written reports concerning Plaintiff's urinalysis, and indicated that

they appeared to have been properly completed.

The Court has reviewed the transcript[3] of the hearing conducted by Hopkins.  The

transcript indicates that Hopkins addressed all of Plaintiff's requests for additional

documentation, and adjourned the hearing several times to do so.  The only documents

---

[2] 7 NYCRR § 254.6(b) states, in pertinent part, that "[w]hen an inmate's mental state or intellectual capacity is at issue, a hearing officer shall consider evidence regarding the inmate's mental condition or intellectual capacity at the time of the incident and at the time of the hearing in accordance with this section."   Plaintiff's mental state was "at issue," because he had been sent to CNYPC for evaluation following his apparent suicide attempt, which delayed the hearing. *See*, 7 NYCRR § 254.6(b)(1)(viii). Bezio reversed the conviction and ordered a new hearing, because Cronin did not evaluate Plaintiff's mental condition.  However, there is no indication that Plaintiff's mental condition actually was a factor in his alleged drug use or in his ability to participate in the hearing.

[3] *See*, Docket No. [#41].

that Plaintiff was not given were ones that no longer existed.  Hopkins reviewed Taylor's misbehavior report and the other documentation supporting the misbehavior report. Hopkins attempted to contact Taylor, who was retired from employment with DOCCS, to testify, but was unable to do so.  Hopkins also attempted to obtain documentation concerning calibration of the drug testing equipment, but was likewise unable to do so. However, as noted above, Hopkins took testimony from Nowaczyk.  In addition to testifying concerning Taylor's training and paperwork, Nowaczyk indicated that, although there was no documentation concerning the calibration of the drug testing equipment, such equipment was electronically self-calibrated each day, and would not operate if there was any type of malfunction.  Hopkins also obtained testimony from the Office of Mental Health concerning Plaintiff's mental status.  At the close of the hearing, Plaintiff objected that Hopkins had not called  Yost as a witness, but Hopkins reminded Plaintiff that he had never requested to have Yost testify.   Hopkins found Plaintiff guilty and imposed a sentence primarily consisting of twelve months in SHU.  In regard to the sentence, Hopkins noted that the subject charge was Plaintiff's twelfth drug related charge.  Overall, it appears that Hopkins took great care to ensure that Plaintiff's procedural due process rights were protected.

Plaintiff appealed, and on October 2, 2008, Bezio affirmed Hopkins' ruling.  Plaintiff requested reconsideration, and also filed an Article 78 proceeding in New York State Supreme Court, Chemung County.  On October 30, 2008, Bezio administratively reversed Plaintiff's conviction and expunged Plaintiff's record.  In his decision, Bezio stated: "The hearing record fails to indicate that relevant documents (drug testing forms) were provided to the inmate as required."  Presumably, Bezio was referring to the calibration records which had been discarded.

4

Prior to having his second conviction reversed, Plaintiff was transferred to Five Points to serve his SHU sentence.  On or about September 24, 2008, Plaintiff covered his cell window and feedup hatch with paper, which prevented staff from seeing into his cell. Staff directed Plaintiff to remove the paper, but he refused.  Corrections Sergeant Jastrzab ("Jastrzab") directed a cell extraction team to enter Plaintiff's cell.  Corrections Officer Shultz ("Schultz") entered Plaintiff's cell first, with a plexiglass shield, and Plaintiff moved aggressively toward Schultz and punched the shield.  As a result, several officers entered the cell, subdued Plaintiff and placed him in handcuffs and leg shackles, and carried him to an observation cell.  During the cell extraction, Schultz put handcuffs on Plaintiff. According to Jastrzab, Plaintiff never complained that his handcuffs were too tight. Jastrzab Aff. [#34-7] at ¶ 3.  Plaintiff now contends, however, that the handcuffs were too tight, and caused him to lose feeling in his hand and/or thumb.  Plaintiff also contends that he experienced pain in his ankle/achilles tendon, where a corrections officer hit him with a baton.  On this point, it is undisputed that Corrections Officer McIntyre ("McIntyre"), who is not a party to this action, hit Plaintiff in the ankle with a baton during the cell extraction.

On September 24, 2008, Jastrzab issued Plaintiff a misbehavior report, charging him with violations including refusing a direct order, assault on staff, and creating a disturbance.   Jastrzab also placed Plaintiff on suicide watch. Plaintiff contends that Jastrzab improperly kept him in an observation cell for four days without having Plaintiff examined by the Mental Health Unit.  On November 12, 2008, Hearing Officer Rasmus ("Rasmus") conducted a disciplinary hearing.  The Court has reviewed the transcript of the

hearing. *See*, Docket No. [#41].[4]   The transcript indicates that Plaintiff pleaded guilty to blocking his cell window, but otherwise refused to enter a plea to the remaining charges. Plaintiff admitted that he placed paper over his cell window because he was upset "about the Law Library." Docket No. [#41], Ex. C at p. 8.   Plaintiff indicated that he has "anger issues," and that he was very angry about the Law Library and lost his ability to reason during the incident. *Id*. at p 29.   Plaintiff indicated that he did not remember what happened after his cell door was opened, because he had post-traumatic stress disorder ("PTSD"). *Id*. ("[W]hen the door opened, I can't remember anything else that happened from that door, from that time."); see also, *id*. at p. 32 (Plaintiff stated that he "blacked out" and did not know what happened for the next two hours); *id*. at 58 ("I don't remember anything."). Nevertheless, Plaintiff indicated that officers handcuffed him, and someone hit him on the achilles tendon with a baton.  However, Plaintiff stated that he could not remember which officers were in his cell. *Id*. at 9.  Jastrzab testified at the hearing that when officers opened Plaintiff's cell door, Plaintiff struck the plexiglass shield that one of the officers was carrying several times, whereupon the officers restrained Plaintiff. *Id*. at p. 44.  Schultz testified that he entered Plaintiff's cell carrying a plexiglass shield, and that Plaintiff struck the shield, whereupon the officers placed Plaintiff on his bed, and applied handcuffs and leg restraints. *Id*. at pp. 53-54.

On February 20, 2009, Plaintiff commenced this action against Bezio, Bradt, Shaw,

---

[4]On December 22, 2011, the Court issued an Order [#40] directing Defendants' counsel to file the transcripts from the subject prison disciplinary hearings.  On December 28, 2011, Defendants filed hearing transcripts [#41].  The Court had intended to receive the transcripts of the hearings conducted by Cronin and Hopkins.  However, Defendants filed the transcript from the hearing conducted by Hopkins, and the transcript of disciplinary hearing conducted on November 12, 2008, at Five Points, by Hearing Officer Rasmus ("Rasmus"), concerning the incident in which Plaintiff was removed from his cell.  Plaintiff is not asserting a procedural due process claim against Rasmus, and Rasmus is not a party to this action. Nevertheless, the transcript sheds light on the excessive force claim.

Cronin, Yosh, Taylor, Hopkins, Jastrzab, and Schultz.  Plaintiff also sued Brian Fischer ("Fischer"), Commissioner of DOCCS.  Following a period of pre-trial discovery, on June 25, 2010, Plaintiff filed the subject motion for summary judgment [#32].  Plaintiff maintains that he is entitled to summary judgment against Cronin and Hopkins for violating his procedural due process rights during the disciplinary hearings which they conducted.[5] Plaintiff He further contends that Bradt and Fischer were aware of the due process violations from his appeals, and failed to remedy those violations. *Id*. at ¶ 31.  Plaintiff also indicates that he was subjected to excessive force that was not justified by legitimate penological interests. Id. at ¶ 32.

On August 23, 2010, Defendants filed the subject cross-motion for summary judgment [#34].[6] Defendants contend that they are entitled to summary judgment for the following reasons: 1) Shaw, Yost, and Taylor are not liable under § 1983, because issuing a false misbehavior is not a constitutional violation; 2) any claim pertaining to the hearing conducted by Cronin is moot, because Plaintiff's conviction was overturned, and because the failure to follow a state administrative rule, concerning mental health evaluation, does not establish a due process violation;  3) Cronin, Hopkins, Bradt, and Bezio did not violate Plaintiff's due process rights, because his convictions were supported by some evidence; 4) Fischer was not personally involved in the hearings or appeals; and 5) Schultz and Jastrzab used reasonable force in removing Plaintiff from his cell.

On December 7, 2011, the Court issued an Order [#39], directing Plaintiff to show

---

[5] As discussed further below, Plaintiff states, for example, that his procedural due process rights were violated because he was not informed of the evidence that the hearing officers relied upon. *See, id*. at ¶ 28 ("I was denied the right to know the evidence relied on by the hearing guard." [sic]).

[6] Defendants provided the *pro se* Plaintiff with the *Irby* notice required by Local Rule of Civil Procedure 56.2. *See*, Docket No. [#34-2].

cause on or before January 3, 2012, why this action should not be dismissed for failure to

prosecute and for failure to provide the Court with his current address.   On January 5,

2012, Plaintiff filed a document indicating that his papers are lost.   The Court will decide

the fully-briefed summary judgment motions on the merits, pursuant to *Styles v. Goord*, No.

10-3129-pr, 431 Fed.Appx. 31, 2011 WL 2473508 (2d Cir. Jun. 23, 2011) ("[T]he district

court failed to consider ruling on the pending, fully-submitted summary judgment motion

as an alternative to dismissing under Rule 41(b).   As this Court has emphasized,

resolutions on summary judgment are generally to be preferred to dismissals under Rule

41(b).") (citing *LeSane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 210-211 (2d Cir. 2001),

internal quotation marks omitted).[7]

## DISCUSSION

Summary judgment may not be granted unless "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." FRCP 56(a).   A party seeking summary judgment bears the burden of establishing that

no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157

(1970).   "[T]he movant must make a prima facie showing that the standard for obtaining

summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a]

(Matthew Bender 3d ed.).

The underlying facts contained in affidavits, attached exhibits, and depositions, must

be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S.

---

[7] On January 5, 2012, after this Decision and Order was in draft form, Plaintiff filed a response to the Court's Order and a request for appointment of counsel. *See*, Docket No. [#43].  Plaintiff's request for appointment of counsel is denied for the same reasons that the Court denied his earlier motion for appointment of counsel. See, Decision and Order [#38].  Otherwise, Plaintiff's submission asks the Court not to dismiss his action for failure to prosecute.  As noted above, the Court is not going to dismiss the action for failure to prosecute, and instead is dismissing the action on the merits, based on the summary judgment motions.

654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993). Moreover, since Plaintiff is proceeding *pro se*, the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles generally applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. See, *e.g., Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977).
>
> ***
>
> An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir.1996). Personal involvement can be shown by: evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122, 127 (2d Cir. 2004); *see also, Platt v. Incorporated Village of Southampton*, 391 Fed.Appx. 62, 2010 WL 3393738 at *3 (2d Cir. Aug. 30, 2010) ("A supervisory official may be personally liable if he or she has actual or constructive notice of unconstitutional practices and demonstrates

gross negligence or deliberate indifference by failing to act.  Supervisory liability may be imposed where an official demonstrates gross negligence or deliberate indifference to constitutional rights by failing to act on information indicating that unconstitutional practices are taking place.  We cannot say, however, that an allegation that a supervisory official ignored a letter protesting past unconstitutional conduct is, without more, sufficient to state a claim that the official was 'personally involved' in the unconstitutional conduct.") (citations and internal quotation marks omitted).[8]  It is well settled that "mere linkage in the prison chain of command is insufficient to implicate . . . a prison superintendent in a § 1983 claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).

### No Personal Involvement By Fischer

Defendants maintain that Fischer was not personally involved in any alleged constitutional violation.  Having reviewed the entire record, the Court does not see any basis  to impose § 1983 liability against Fischer.  Most notably, there is no indication that Fischer was personally involved in Plaintiff's appeals from his disciplinary convictions.  Instead, those appeals were handled by Bezio.  Accordingly, Fischer is entitled to summary judgment.

### Pre-Hearing Placement in SHU

Plaintiff contends that Shaw placed him in SHU, based on suspected drug use.  In that regard, Plaintiff was identified as being suspected of having used drugs by Lt.

---

[8]Following the Supreme Court's decision in *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948 (2009), there is some disagreement among district courts in this Circuit as to whether all of the foregoing "*Colon* factors" still apply. *See, e.g., Dilworth v. Goldberg*, 2011 W L 3501869 at * 17 (2d Cir. Jul. 28, 2011) ("*Iqbal* has caused some courts to question whether all five of the personal involvement categories survive that decision.") (collecting cases).  It is unclear whether *Iqbal* overrules or limits *Colon*, therefore, in the absence of contrary direction from the Second Circuit, the Court will continue to apply those factors. *See, Platt v, Incorporated Village of Southampton*, 391 Fed.Appx. 62, citing *Back v. Hastings on Hudson Union Free Sch. Dist.*, which sets forth all five of the *Colon* bases for imposing supervisory liability.

Schonstheimer, who is not a party to this action.  According to Plaintiff, he was in SHU for only one day, before he attempted suicide because he believed that he was being set up for a false misbehavior report.  Following Plaintiff's alleged suicide attempt, he was sent to CNYPC for mental health observation.  These facts do not establish a constitutional violation against Shaw. *See, Jackson v. Goord*, No. 06–CV–6172 CJS, 2011 WL 4829850 at *14 (W.D.N.Y. Oct. 12, 2011)  (Fifteen-day pre-hearing confinement in SHU did not impose an atypical and significant hardship on the inmate).  Accordingly, Shaw is entitled to summary judgment.

### *Misbehavior Report*

Plaintiff maintains that Yost and Taylor conspired to file a false misbehavior report against him.[9]  In support of that claim, Plaintiff contends that he never gave a urine sample to Yost.  Plaintiff does not allege that Yost or Taylor had a particular motive, such as a desire to retaliate against him.  Accordingly, Yost and Taylor are entitled to summary judgment, since it is well settled that the mere filing of a false misbehavior report does not rise to the level of a constitutional violation. *See, Boddie v. Schnieder*, 105 F.3d 857,  862 (2d Cir. 1997) ("[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report.") (citation omitted).

### *Due Process at Disciplinary Hearings*

It is clear that where prison inmates have a liberty interest in avoiding disciplinary

---

[9]Plaintiff alleges that Yost falsely claimed to have taken a urine sample, but he does not expressly contend that Taylor was aware of Yost's actions.  Therefore, even assuming that Yost did lie about taking Plaintiff's urine, it is possible that he gave another urine sample to Taylor, without Taylor's knowledge, which tested positive for drug use.  However, the Court will liberally construe Plaintiff's papers as indicating that Yost and Taylor acted together.

confinement[10], they are entitled to procedural due process protections: "Inmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004) (citation omitted).  To comport with due process, a disciplinary ruling must be supported by "some evidence." *Id*. at 487-488 (citation omitted).   "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any evidence* in the record that could support the conclusion reached by the disciplinary board." *Id*. at 488 (emphasis added, citation omitted).  The Second Circuit interprets this statement to require "'reliable evidence' of the inmate's guilt." *Id*.

Inmates who are confined to SHU pending a disciplinary hearing also have a "limited" constitutional right to assistance in preparing a defense:

> [In *Eng v. Coughlin*, 858 F.2d 889, 891-92 (2d Cir. 1988)] we warned: '[F]or inmates disabled by confinement in SHU, or transferred to another facility, the right to substantive assistance is an obligation imposed by the Due Process Clause of the Fourteenth Amendment. Further, the assistance must be provided in good faith and in the best interests of the inmate.'   We therefore held that in the future "an assigned assistant who does nothing to assist a disabled prisoner ... has failed to accord the prisoner his limited constitutional due process right of assistance."

*Ayers v. Ryan*, 152 F.3d 77, 81 (2d Cir. 1998) (*quoting Eng v. Coughlin*, 858 F.2d 889, 891-92 (2d Cir. 1988)).  The assistant's obligations "include gathering evidence, obtaining

---

[10]"A prisoner's liberty interest is implicated when an institution's disciplinary decision results in an 'atypical and significant hardship ... in relation to the ordinary incidents of prison life.'" *Luna v. Pico*, 356 F.3d 481, 487 n.3 (2d Cir. 2004) (*quoting Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).

documents and relevant tapes, and interviewing witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself." *Eng v. Coughlin*, 858 F.2d at 898.

An inmate's procedural due process rights also include the right to an impartial hearing officer.  "This standard is satisfied by a hearing officer who does not prejudge the evidence and who cannot say how he would assess evidence he has not yet seen. However, hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Murray v. Jacobs,* No. 04–CV–6231–CJS, 2011 WL 4074531 at *7 (W.D.N.Y. Sep. 13, 2011) (citations and internal quotation marks omitted).

Here, liberally construing the *pro se* Plaintiff's procedural due process claims, he maintains that at his hearings before Cronin and Hopkins he was prevented from proving his defense, which was that he was innocent of the charge because he never gave a urine sample to Yost.  Plaintiff also contends that there was insufficient evidence that the drug testing equipment was functioning properly.[11]  Plaintiff further suggests that the hearing officers were biased, and that their decisions were not supported by sufficient evidence. See, [#18] at 7.  Plaintiff also contends that his due process rights were violated because

---

[11] *See, e.g.*, Complaint [#1] at 12 ("Plaintiff was harmed by the herein defendants from preventing Plaintiff from properly presenting evidence in his defense."); *see also*, Response to Defendants' Answers [#15] at 2 (Indicating that Plaintiff's due process rights were violated when he was denied exculpatory documentation concerning the drug test at the hearing); *id.* at 2-3 (Indicating that he was denied due process when Taylor failed to testify at the second hearing); Id. at 3-4 (Indicating that he was  "deprived [of] the full panoply of procedural safeguards that prisoners must be constitutional entitled [sic] at a disciplinary proceeding, defendant Hopkins abridgement of vindictive [Plaintiff probably meant "vindicating"] testimony, during the hearing precluded the absolute fact of reliability, when he provided in place of defendant Taylor['s] testimony prison guard Nowalchek['s] testimony."); see also, Pl. Memo of Law [#15] at 11 ("Defendant Hopkins violated plaintiff['s] right to call witnesses to testify in his behalf."); *id.* at 12 (Referring to Cronin's and Hopkins' " "egregious curtailment of plaintiff['s] right to present documentary evidence."); *id.* at 15, 17 (Indicating that he was denied documentation showing whether the drug testing equipment was working properly at the time of the alleged test).

Cronin did not conduct a mental health evaluation, as required by state regulation.[12] He further states that he was not given a copy of the misbehavior report prior to the hearing, even though he admits that he signed for having received such a copy, and he obviously was aware of the charge against him prior to the hearing.  He also complains that he was denied the right to call witnesses, but does not explain who he was prevented from calling. And finally, he contends that he was denied two documents – the "tech lab log book" and a copy of the "EST check-list" or "CTS checklist," and that he objected to this at the hearing. See, [#34-7] at 17.

Viewing the entire record in the light most-favorable to Plaintiff, the Court finds that Plaintiff cannot sustain a procedural due process claim against either Cronin or Hopkins. Plaintiff was provided with the documents that he requested insofar as they existed, and he was permitted to call the witnesses he wanted, to the extent that they had relevant information.  Plaintiff has not provided any evidence that Cronin or Hopkins was biased. Moreover, the dispositions by Cronin and Hopkins were supported by some evidence. Plaintiff was notified of the charges against him, was provided assistance in preparing for the hearings, and was given a written explanation of the dispositions.  To the extent that Cronin may have failed to follow the mental health procedures set forth in 7 NYCRR § 254.6(b) by not inquiring into Plaintiff's mental health history, such failure does not establish a federal due process violation, though it did result in the reversal of his conviction and result in a new hearing. *See, Martinez v. Minogue*, No. 9:06-CV-546, 2008

[12] *See, id*. at 15 ("The disciplinary hearing[s] conducted on April 16, 2008 and May 5, 2008 was illegal in that the proceeding was invalid and resulting punishment unconstitutional because he was denied at the first hearing by defendant [Cronin] a mental health assessment pursuant to 7 NYRCC 254.6 and at the rehearing held by defendant Hopkins was denied the right to call the testing officer as a witness."); *see also*, Memo in Support of Settlement [#18 ] at 1. (Indicating that Cronin erred by failing to contact a "mental health clinician" as required by state regulation).

WL 4241746 at *6 (N.D.N.Y. Sep. 11, 2008) ("It is well-established . . . that a violation of state law or regulation in and of itself will not establish a constitutional violation or support a civil rights claim under 42 U.S.C. § 1983.") (citations omitted); *Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights."), *cert. den*. 484 U.S. 896, 108 S.Ct. 229 (1987).  As for Bradt, he is similarly not liable, since there was no underlying constitutional violation.  Accordingly, Cronin, Hopkins, and Bradt are entitled to summary judgment.

<u>Use of Force to Remove Plaintiff From His Cell</u>

The legal principles concerning an excessive force claim in the prison context are well settled:

> Analysis of a claim for use of excessive force begins with "identif[ication of] the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see generally Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (the first step in analysis of any claim brought under § 1983 is to identify the precise constitutional right allegedly violated). In the context of a claim by a prisoner that he was subjected to excessive force by prison employees, the source of the ban against such force is the Eighth Amendment's ban on cruel and unusual punishments. The validity of the prisoner's claim must "be judged by reference to th[is] specific constitutional standard ..., rather than to some generalized 'excessive force' standard." *Graham v. Connor*, 490 U.S. at 394, 109 S.Ct. 1865; *see, e.g., Whitley v. Albers*, 475 U.S. 312, 318-26, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (claim of excessive force to subdue convicted prisoner is to be analyzed under an Eighth Amendment standard).

> A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect. *See, e.g., Hudson v. McMillian*, 503 U.S. 1, 7-8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir.1999). The subjective component of the claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' " in light of the particular circumstances

surrounding the challenged conduct. *Id*. at 262 (*quoting Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *see, e.g., Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir.2000); *Davidson v. Flynn*, 32 F.3d 27, 30 & n. 2 (2d Cir.1994). When prison officials are accused of using excessive force, the "wantonness" issue turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7, 112 S.Ct. 995; *see also Blyden v. Mancusi*, 186 F.3d at 262-63.

The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of "contemporary standards of decency." *Hudson*, 503 U.S. at 8, 112 S.Ct. 995 (internal quotation marks omitted). In assessing this component, the court must ask whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Id*. (*quoting Wilson*, 501 U.S. at 298, 111 S.Ct. 2321). But when prison officials use force to cause harm maliciously and sadistically, "contemporary standards of decency always are violated.... This is true whether or not significant injury is evident." *Hudson*, 503 U.S. at 9, 112 S.Ct. 995.

Accordingly, where a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically, our Court has reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak. *See, e.g., Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir.2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury"); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir.1999) (vacating district court's sua sponte dismissal of prisoner's complaint, though characterizing his "excessive force claim [a]s weak and his evidence [as] extremely thin" where prisoner alleged that he was hit by prison guards "after he was handcuffed" but "the only injuries he suffered were a bruised shin and swelling over his left knee").

Nonetheless, the Eighth Amendment's prohibition against cruel and unusual punishment does not extend to "*de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 10, 112 S.Ct. 995 (internal quotation marks omitted). "

'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Id*. at 9, 112 S.Ct. 995 (*quoting Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973)).

*Wright v. Goord*, 554 F.3d 255, 268-69 (2d Cir. 2009).

Here, Shultz and Jastrzab contend that they are entitled to summary judgment on Plaintiff's excessive force claim, because they merely used minimal force to subdue him and remove him from his cell, after he blocked the openings to his cell, refused to remove the coverings when asked, and then attacked Schultz as he entered the cell.[13]  As noted earlier, Plaintiff testified at his prison disciplinary hearing that he had no recollection of what happened after officers entered his cell, and that he could no identify any of the officers. Nevertheless, he contends that officers should not have handcuffed him behind his back, because there was some type of notice in his cell advising staff not to handcuff him behind his back. *See*, Memo in Support of Summary Judgment [#32] at 19.  Specifically, he states that a notice indicating that he should not be handcuffed behind his back was "on his wall." See, Pl. Memo in Support of Summary Judgment at 19.  Plaintiff claims that as a result of being handcuffed, he lost feeling in his left hand. *Id*.

The malicious or sadistic application of handcuffs may constitute an Eight Amendment violation.  On this point,

> [a]lthough handcuffs must be reasonably tight to be effective, overly tight handcuffing can constitute excessive force.   In evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the

---

[13]In support of the summary judgment motion, Defendants submitted a videotape, which the Court has viewed, showing the hallway outside Plaintiff's cell.  The camera does not show the interior of the cell. The film shows ten corrections officers in their ordinary uniforms (not riot gear) assemble outside of a cell. Seven of the officers then enter the cell, while three remain outside the cell.  Approximately 2.5 minutes later, the officers exit the cell, carrying an inmate horizontally, who is handcuffed behind his back and facing downward.

handcuffs were unreasonably tight; 2) the defendants ignored the plaintiff s pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists.

***

There is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort.

*Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F.Supp.2d 459, 468 -469 (S.D.N.Y. 2008) (citations and internal quotation marks omitted).

In this case, Plaintiff apparently maintains that Schultz should have known about his unspecified preexisting medical condition, since there was some type of notice on Plaintiff's cell wall, indicating that he should not be handcuffed behind his back. However, there is no indication that Schultz was actually aware of such notice, or that he had any other reason to know that handcuffing Plaintiff might cause him harm. *See, e.g., Wright v. Goord*, 554 F.3d at 270 (Finding no evidence that corrections officer acted sadistically or maliciously by pushing Plaintiff on the site of a surgical scar, since there was no evidence that the officer "knew or had reason to know that [the inmate's] abdomen was unusually tender.") There is also no indication that Schultz applied the handcuffs maliciously or sadistically, and it is undisputed that Plaintiff did not complain that the handcuffs were too tight. Additionally, it is undisputed that the officers applied force for a legitimate reason, in that Plaintiff had essentially blockaded himself in his cell, refused to respond to inquiries, and attacked Schultz when he entered the cell. The only remaining aspect of Plaintiff's excessive force claim is that he was struck on the ankle with a baton, but McIntyre, the officer who hit Plaintiff with the baton, is not a party to this action. Accordingly, Schultz and Jastrzab are entitled to summary judgment on the excessive force claim.

18

*Placement on Suicide Watch*

Plaintiff's last claim is that Jastrzab violated his federal constitutional rights by placing him in an observation cell for four days, following the cell extraction.  Plaintiff states: "I was taken to the observation unit and was forced to remain there for four days under suicide watch and constant 24 hour observation without being seen by any MHU staff." Memo in Support of Summary Judgment [#32]  at 19.  Plaintiff, though, does not contend that he was suffering from any condition that required him to be seen by MHU.[14]  Nor does he otherwise complain about the conditions of confinement in the observation cell.  His allegations do not establish a constitutional violation. *See, Gonzales v. Carpenter*, No. 9:08-CV-629 (LEK/ATB), 2011 WL 768990 at *9-12 (N.D.N.Y. Jan. 3, 2011) ("[T]he short-term confinement of plaintiff in a prison mental health clinic for observation did not implicate a liberty interest triggering due process protection. Nothing involving plaintiff's stay at the OMH satellite unit subjected him to cruel and unusual punishment under the Eighth Amendment."), report and recommendation adopted by 2011 WL 767546 (N.D.N.Y. Feb. 25, 2011).  Accordingly, Jastrzab is entitled to summary judgment on this claim.

CONCLUSION

Plaintiff's motion for summary judgment [#32] is denied, Defendants' cross-motion for summary judgment [#34] is granted, and this action is dismissed with prejudice.  The Court certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962).  Further requests to proceed on

---

[14]To the contrary, Plaintiff maintains that he was forcibly taken from his usual cell and moved to the observation cell for no reason at all. *See*, [#18] at 9.  Accordingly, there is no indication that Jastrzab was deliberately indifferent to any serious medical need of Plaintiff's.

appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

      SO ORDERED.

Dated:      Rochester, New York
           January 20, 2012

                         ENTER:


                         /s/ Charles J. Siragusa_____
                         CHARLES J. SIRAGUSA
                         United States District Judge